EVE LEUMA, TAVITA AVEGALIO, and
JOSEPH AVEGALIO, Plaintiffs,
v.
TONY WILLIS, Defendant.

High Court of American Samoa
Land and Titles Division

LT No. 47-79

December 16, 1980

MURPHY, Associate Justice.

### STATEMENT OF THE CASE

This action arose in 1979 when Defendant, Tony Willis, began construction of a house on a portion of the land claimed by Plaintiffs. Plaintiff Eve Leuma, Tavita Avegalio and Joseph Avegalio claim to be the individual owners of certain real property located on or near the land known as "Lega'oa." They claim that their father, Avegalio Eseese, gained individual ownership of the land by originally clearing, planting, and occupying said land. The father died in 1973 and Plaintiffs claim title by intestate succession.

Defendant Tony Willis claims he is the owner of the disputed land, that it is a portion of a much larger parcel of land he and others own, which they refer to as "Lega'oa." He does not dispute that Eseese cleared and planted on the subject property, but contends that the clearing and planting was by virtue of an oral license granted by Willis' mother, Defendant's predecessor in interest.

Willis also contends that whatever interest Eseese may have had in the property has been abandoned. Willis' claim of ownership is founded entirely upon a deed referred to in a judgment entered by the High Court on May 4, 1906, To'omata v. People of Leone (CA No. 5-1906), and further construed in Falesau v. Tuitele (CA No. 19-1918).

Plaintiffs, inter alia, seek to restrain defendant from continuing construction of the house. Defendant seeks to enjoin Plaintiffs from use or

possession of the subject property.

## FINDINGS OF FACT

Based upon the testimony and evidence presented in Trial September 16, 17, & 18, 1980, as well as an inspection of the property by the court we make the following findings of fact:

1. The subject property consists of broken land, slopes rising to ridges, and sheer cliffs. It is at the end of a large valley which runs from the sea and ends at the waterfall. No part of the property in dispute appears to be flat land of the valley; although the site for the house is level, it is considerably higher than the valley floor.

2. During the 1940's, the Government (Territorial or United States) constructed a road through the subject property to a waterfall where it constructed a catchment and a pipe system, a modification of which is still in use by the village of Leone. The area around the waterfall consists of virgin jungle, cliffs, and a stream bed which runs through Leone and into the sea.

3. At least some portions of the subject property were cleared and planted by Eseese approximately 40 years ago.

4. In 1966 most of the crops planted by Eseese were destroyed by hurricane. Since then, Plaintiffs have had little or nothing to do with the land. Some other people, with Plaintiffs' permission, have planted and harvested crops (mostly bananas) on portions of the disputed land. Some of these banana plants were destroyed by Defendant in preparing the foundation for the house.

5. Defendant began clearing and planting some portions of the subject property in 1975.

6. The Court takes judicial notice of the proceedings in 5-1906 and 19-1918.

7. None of the parties has constructed a house or lived on the subject land until 1979 when Defendant began construction.

8. Some of the plaintiffs reside in California and resided there at the time of their father's death.

## OPINION

Since both parties claim individual ownership of this property, a review of the history of the concept of individual ownership in American Samoa is useful.

## HISTORY OF LAND OWNERSHIP IN AMERICAN SAMOA
### I. General Trends

Prior to 1899, land in American Samoa was subject to similar laws and customs as in that which is now Western Samoa, for as most readers of this opinion know, for many thousands of years, there was only one Samoa. It has only been in recent history that the people from other countries have come to the Samoan islands, exerting their foreign laws and customs on the descendants of the original inhabitants of these islands.

Of the total area of that which is now American Samoa (excluding Swain's island and the uninhabited Rose Island), or about 45,500 acres, approximately 550-600 acres were acquired by papalagis before 1889, the freehold title being confirmed by the Land Commission.[1] This land commission

--------------------------

1. Kessing, Modern Samoa, its government and changing life, 268 (1978 reprint of 1934 ed.).

was created in the Berlin Act of 1889. One of the purposes of the Berlin Act was that Samoans might "keep their lands for cultivation by themselves and by their children after them." The Act declared that all further alienation of native lands to non-natives should be prohibited, with two exceptions. The land commission and the Apia Court heard all land matters for all of the Samoan Islands until 1899 when Tutuila and Manu'a islands were ceded to the United States. At that time, there was only freehold land created by the Apia Court, and native or communal land. With the cession of Tutuila and Aunu'u the High Court of American Samoa commenced hearing disputes as to title to land, and it was at this point that land law in American Samoa began diverging from land law in what is now Western Samoa.

Although not well documented, it seems that previous and present custom in Western Samoa was not to separate title to land from a matai title. When a village was established, the land in that valley belonged to the people of that village. A matai could claim land for his family or clan by clearing and then working. Any land that was not under the direct "pule" of a matai remained belonging to the people of the village. Paramount chiefs would have a more general control of larger areas. It is important to keep in mind that the power of a matai was really defined not by title name, but by the land over which he had control. Through this system, ownership of land from the mountain peak to the reef defined among the various families, villages, and districts. Under the present Western Samoa Constitution there are three types of Land in Western Samoa: Government, freehold, and customary (i'e:communal).

II. History of Individually Owned Land in American Samoa

> "Can't you stop thinking about 'owning things,' said Vai. How many times have I told you that no one owns things in Samoa. We only 'use' them. If we clear and plant this land it is ours. If we stop using it someone else can have it." Calkins, My Samoan Chief, The University Press of Hawaii (1962), at 92.

Given the scanty number of statutes in this Territory covering the subject of alienation and title to real property,[2] the quagmire we find ourselves in presently has developed through 80 years of case law. While succession to matai titles was originally governed by custom and tradition, it was soon changed so it was determined by statute.[3] Succession to land seems to have been governed by possession and control. See Sapela v. Veevalu (1905) 1 ASR 124, 129, and Siopitu v. Faiivae (date unknown) 1 ASR 138, in which this court was already trying to apply the common law concept

-----

2. We find it interesting that a culture founded upon its communal land system has approximately 17 pages of laws covering the entire area of real property, while the juvenile act of 1980 consists of 58 pages and has been applied less than ten times this year.

3. While it is unclear how the High Court became the arbitrar of matai titles, the first law we can find giving the court the power was Regulation No. 8-1906, enacted September 14, 1906 by C.B.T. Moore, Commander, U.S.N., Governor. When the court became involved with disputes as to matai titles, it also became involved with disputes as to land titles.

of adverse possession to the Samoan land system, the foreign concept of adverse possession being based on possession and control.

A review of these early land title cases leads us to believe that the reasoning behind the decisions was that title to native or communal land (these terms will be used synonymously throughout this opinion) was never legally bound to the matai titles. As mentioned previously, the two titles have remained in tact in Western Samoa. The Court then began securing claims to title to land by means of surveys and registration of title. See Vili v. Faiivae (date unknown) 1 ASR 138, 139; Maloata v. Leoso (1938) 2 ASR 26, 28. As lands were surveyed and registered, the remaining areas (most of the land on the island), primarily virgin forest, remained unclaimed and unregistered. We can find nothing in the cases or early statutes in which the Court recognized the superior claim of a paramount chief or the people of a village to all the lands extending from the ocean to the mountain peaks. In fact, the Court specifically rejected claims to land title made by Tuimanu'a on the grounds that the title was political. Alesana v. Siupolu (1922) 1 ASR 346, 351. This is another example of the court limiting the title to the land to the cultivator or user of the land. As we look back at these cases in general, and the Tuimanu'a case in particular, we note that the court constantly refers to English common law, Tiffiny of Real Property, Maine Ancient Law, or tries to compare the King of Manu'a to the King of England, and this was the rationale on which the Court limited land title to the cultivator or user.

In the years from the cession of the eastern Samoan islands to the United States until the beginning of World War II, the Court, unwittingly we think, laid the precedents necessary to file a claim of individual ownership by leaving virgin land unregistered and by favoring the user or cultivator in land disputes.

It is clear from early decisions that all surveyed and registered native land vested a fee in someone or something. Maloata v. Leoso (1905) 1 ASR 134, 138. But in the same case, the court also said:

> It was well known custom in Samoa that the individual owner of property, not withstanding his well established rights to it, was subject to the will of the community and upon the commission of any act contrary to the desire of the community he would be banished or have to submit to gross degradation imposed by the people (underscoring added). Id. at 137.

The Court seems to be talking about some form of ownership different from the traditional papalagi concept of fee simple. Five years later, the court held:

> ...It would be a disastrous shock to the social system of Samoa under which it has progressed already so far towards civilization to permit a member of a family to withdraw entirely and grant him a fee-simple title of land which he had previously occupied and cultivated under the control of the head of the family. Sapela v. Mageo (1910) 1 ASR 223, 224.

And even as late as 1932 we see:

> The Court does not favor the holding of large tracts of land by individual Samoans, --it is manifestly better for the interests of all the Samoans that land be more or less equally distributed among the respective matais in Samoa. Satele v. Afoa (1932) 1 ASR 467, 471.

51

While in 1900 there had been only two types of land, freehold and native land, the decisions cited above unwittingly recognized two divisions of native land: native land in which a trust is imposed on the matai, and another form of land not specifically defined, but having some of the qualities of fa'a Samoa and some of the qualities of fa'a papalagi.

World War II seems to have brought on an awareness of the potential in these decisions cited above. In Tiumalu v. Simaile (1945) 2 ASR 222, 224, the court recognized specifically the ownership of land other than freehold as personal. The presumption of individual ownership in absence of evidence of communal ownership was established in this case, as well as the right of the estate being inheritable.

In 1947, in a case involving the Defendant in this action, the court belatedly recognized problems of alienation caused by its prior decisions, and supported a statute prohibiting alienation of land on the basis of blood. Willis v. Willis (1947) 2 ASR 276, 278-279. This decision was based on blood lines and was a departure from the court's previous decisions in which they supported those who cultivated and used the land. This departure may be reconciled because it was descendents of the first users who received the land. Also in 1947, the Court held that virgin bush cleared by a matai could be individually-owned and could be inherited. Tago v. Mauga (1947) 2 ASR 285.

In Letele Family v. Lagoga (1949) 2 ASR 466, the Court adopted a rebuttable presumption that when a matai or his family clears bush land, he does so for the communal family. 2 ASR 466, 469. This case again focused on the use and cultivation as the key to ownership. Accord, Toomata v. Ve'a, (H.C.T.D. 1950) 2 A.S.R. 564, 571; Soliai v. Levu (1949) 2 ASR 440, 442-443.

These decisions suffer from a lack of consistency. When reviewing the lot, we sence the Court was improvising decisions ad hoc to fit the equities of each case. Having established individual ownership, the court then had to prevent alienation of land to non-Samoans; thus the Willis case cited above, which upheld racial classifications for purposes of ownership. Although the 3/4 blood requirement has been modified by subsequent statutes, it remains a racial classification which controls the ownership of land in this Territory. Such a constitutionally suspicious vehicle would not be necessary if the concept of communal land had been faithfully embraced.

In 1948 Justice Morrow started defining individually-owned land by attributing certain characteristics to it. Justice Miyamoto provides an excellent collection of these cases in his opinion in Fanene v. Talio (1977) LT No. 64-77. We draw heavily on the citations in his opinion here, but come to a different conclusion because of a different perception of Samoan custom.

One of the first decisions in which the words "individually-owned land" are used, is the case of Taatiatia v. Misi (1948) 2 ASR 46, in which the Court stated that which the Defendant did to justify his claim to individual ownership of the land, and enunciated the legal basis for the conclusion he reached:

> It is our conclusion from the evidence, which in some
> respects is conflicting, that Misi entered upon the
> land in 1919 while it was bush and cut the large trees
> thereon and that after letting the trees lie for a year
> he burned them and proceeded to put in plantations, and
> and that he has used the land ever since for plantation
> purposes. The land being bush and not occupied by anyone
> was res nullius, the property of no one (sic). When

Misi entered upon it and cut down the trees and put in his
plantations and claimed the land as his own, it became
his in accordance with the customs of the Samoans, which
customs, when not in conflict with the laws of American
Samoa or the laws of the United States concerning American
Samoa, are preserved. Sec. 2 of the A.S. code. There is no
law of American Samoa or of the United States concerning
American Samoa in conflict with the customs of the Samoans
with respect to the acquisition of title to bush land.
Blackstone considered that an original title to property
was acquired by the first occupant under a claim of ownership.
II Blackstone's Commentaries, pp.8-10. See also Maine on
Ancient Law, 5th Ed. pp.242-246. We think Misi was such
an occupant. Taatiatia v. Misi (1948) 2 ASR 346, 347.

It seems to us that Justice Morrow misstated Samoan custom (that the
virgin bush belonged to no one), and then applied the law of old England
(Blackstone and Maine) to a land system and culture completely different.
It is no wonder he got such a result as the concept of homesteading
individually-owned land.

Six months later, Justice Morrow decided individually-owned land may be
acquired if a matai gives it away as such. His citation of authority for
this is his judicial knowledge that it has been done in the past:

...We know judicially that some matais in American Samoa
have, with the consent of their family members, given
family lands outright to certain members of their families.
Taetafea testified that she was present and heard old Gi in
1905 make a gift of this land to her and her husband and
that such gift was a reward for splended service rendered
by her husband and herself to the then Gi; also that such
gift was followed by possession by the donees. Gi v.
Taetafea (1948) 2 ASR 401, 403.

It is hard for us to "judicially know" that the old Gi, by giving away the
land "outright" intended to give a fee simple, a concept we "judicially
know" existed then only through a few prior decisions of Samoan courts.
Maybe what the old Gi intended when he gave away the land outright was to
designate that communal land for a particular family's use. From the
authorities we have cited above, that seems more in keeping with the Samoan
tradition than does a gift in fee.

Two weeks later, Justice Morrow stated if virgin, unclaimed land is
cleared and occupied for individual benefit, the Court will find this
sufficient to support a claim of individual ownership. His citations of
authority for this are again Maine and Blackstone. Muli v. Ofoia (1948) 2
ASR 408, 410.

More recently, in a landmark case in individually-owned land, the Court
decided portions of a large parcel of land near the airport were
individually-owned. The justification for this was:

This court has ruled many times that Samoans may
acquire title to land through first occupancy accompanied
by claim of ownership. Soliai v. Lagafua, No. 5-1949 (H.C.
of Am. S.); Faatiliga v. Fano, No. 89-1948 (H.C. of Am. S.);
Gi v. Te'o, No. 35-1961 (H.C. of Am. S.); Magalei et.
al., v. Lualemaga et. al., No.60-1961 (H.C. of Am. S.).
This doctrine of the acquisition of title by first
occupancy coupled with a claim of ownership is approved
in Main's Ancient Law (3rd Am. Ed.) 238. See also 2 Black-

stone 8.  The most common way for a Samoan to acquire title to land is to clear a portion of the virgin bush, put in plantations on the cleared area, and claim it as his own land or the communal land of his family.  This is a recognized way of acquiring land according to Samoan customs.  _Government v. Letuli_ (1963) LT No. 016-63.

In _Haleck_ v. _Tuia_ (1974) LT No. 1386-74, the Court found:

> The Plaintiff entered upon the land in 1947 and began to clear it and use it.  At the time of entry it was virgin bush land.  That no other person ever worked upon this land.  That after viewing the property the Court is satisfied that the plaintiff has substantially cleared the entire tract and a considerable plantation was developed.  That no objections were ever made by anyone during the entire period from 1947 to the time of filing the petition for registration.  The Court further finds that the plaintiff went upon the land as an individual and not under the directioon of a matai; that the work done was entirely at his individual expense, and not as a communal effort.

Based on these findings of fact,  the Court reached the following conclusion of law:

> When an individual goes upon virgin bush land, clears it and develops a plantation, using his own personal resources, and it is done without direction of the matai of the family, and without communal family funds or donated help of the members of the family, the property becomes the individually owned land of the developer, and he is entitled to have the land registered as his individually owned property.

Having reviewed these cases, in _Fanene v. Talio_ (1977) LT No. 64-77, Justice Miyamoto described individually owned land as that land:

> ...(1) cleared in its entirety or substantially so from the virgin bush by an individual through his own initiative and not by, for or under the direction of his aiga or the senior matai, (2) cultivated in its entirety or substantially so by him, and (3) occupied by him or his family or agents continously from the time of the clearing of the bush.

In  trying to define individually-owned land,  it would be  helpful  to have been provided guidance by the Fono,  for after all, the legislators are the elected representatives of the people, and if policy decisions are to be made which will affect all or almost all of the people, it is better to have the  duly  elected  representatives make these decisions than it is  to  have judges make them as appears to have been done in the past.

Unfortunately,  neither  the Fono nor the preceding governors appointed by  the Secretary of Interior have been of much help.   The  definitions  of Native  land and freehold land appeared in the American Samoa Code of 1949,[4] and  remain  unchanged  today.[5]    In  1962,  the  legislature  passed  laws

---

4. A.S. Code 1280 states in part"...  The term 'native land' shall mean communal  land.   The  term  'freehold  lands'  shall mean  all  those  lands included in court grants prior to 1900 which have not, at the request of the owner,  been  returned  to  the  status  of  other  land  in  American  Samoa surrendering its freehold characteristic.

5. 27 A.S.C. 201.

recognizing the concept of individually-owned land,[6] and actually did define individually-owned land in Public Law 7-19 (1962)[7] as follows:

> Sec. 9.0103 - INDIVIDUALLY OWNED LAND: Individually owned land means land that is owned by a person in one of the first two categories named in Sec. 9.0102, or that is owned by an individual or individuals, except lands included in court grants prior to 1900. Such land may be conveyed only to a person or family in the categories mentioned in Sec. 9.0102, except that it may be inherited by devise or descent under the laws of intestate succession, by natural lineal descendants of the owner. If no person is qualified to inherit, the title shall revert to the family from which the title was derived.

As originally enacted, the categories of individuals referred to in Sec. 9.0102 were (1) full blood American Samoan, and (2) a person who is of at least one-half Samoan blood, was born in American Samoa, is a descendant of an American Samoan family, lives with Samoans as a Samoan, has lived in American Samoa for more than five years, and has officially declared his home for life.[8] There is no indication that Secs. 9.0102 and 9.0103 were passed by two successive legislatures as required by Article I, Section 3, and Article II, Section 9, Const. Am. Samoa. (1960). In the last four years, there have been seven attempts to define individually-owned land,[9] none of which has passed both houses.

We are left then, with little legislative guidance, and case law founded on English common law, Blackstone's Commentaries, Maine's Ancient Law, and customs previous high court justices have judicially known.

## CONCLUSIONS OF LAW

1. Plaintiffs' father abandoned the land in 1966. In order to maintain an action based upon original occupancy and use, there must be a present use of the land. The evidence shows that Plaintiffs have not used or otherwise occupied the land since 1966. Ilaoa v. Toilolo, 1 ASR 602, 606; Fanene v. Talio (1977) LT No. 64-77. So even if individually-owned land is that which Justice Morrow may have partially defined, this land is not that.

2. The land is not the individually-owned land of Defendant. We make this conclusion without deciding the validity of the deed through which Willis claims the land. We have found that Willis and his co-tenants were deeded only the flat land of the valley. Since we have found that the land in question is not part of the flat land of the valley, Willis cannot claim this land by the deed, whether or not the deed is valid.

* * *

---

6. 27 A.S.C. 402(a) and 27 A.S.C. 1202(c).

7. Act of April 7, 1962, Pub. L. 7-19, codified IX Code American Samoa, section 9.0103 (1961).

8. See note 7, supra.

9. S.107, 15thFono, 3d Sess. (1978); H.157, 15thFono, 3d Sess. (1978); H.220, 15thFono, 4th Sess. (1978); S.2, 16thFono, 1st Sess. (1979); S.59, 16thFono, 2nd Sess. (1979); H.119, 16thFono, 2nd Sess. (1979); S.97, 16thFono, 3d Sess. (1980).